## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMY PASSWATERS,         *

    Plaintiff,         *

                 Civ. Action No. RDB-18-2923

    v.         *

WICOMICO COUNTY,         *

    Defendant.         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM OPINION

Plaintiff Amy Passwaters ("Plaintiff" or "Passwaters"), a Master Correctional Officer employed at the Wicomico County Department of Corrections ("WCDC") pursues this action against Defendant Wicomico County ("Defendant" or "the County"). Passwaters alleges that the County's decisions to periodically remove her from her post within the Transportation Unit, impose formal discipline against her, and previously terminate her employment constitute acts of discrimination and retaliation.[1] Her Complaint alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e and § 20-606 of the State Government (S.G.) Article of the Maryland Annotated Code. Now pending is the County's Motion for Summary Judgment (ECF No. 18). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated herein, the Defendant's Motion for Summary Judgment (ECF No. 18) is GRANTED and Summary Judgment is ENTERED in favor of the Defendant.

---

[1] In August 2019, Passwaters accepted an offer of re-employment with the WCDC. (Email from Passwaters to Strausburg, Aug. 14, 2019, ECF No. 24-42.)

## BACKGROUND

This case arises from Master Correctional Officer Amy Passwaters' allegation that Wicomico County and members of the Wicomico County Department of Corrections discriminated against her because of her race (caucasian) and sex (female) and retaliated against her by periodically reassigning her from the Transportation Unit of the Wicomico County Department of Corrections to other posts and taking disciplinary action against her. Over the course of a roughly seven-year period, Passwaters lodged numerous grievances challenging her reassignment to different positions within the Department and accusing her superior officers of discrimination. After her complaints were investigated and found to be unsupported by the evidence, Passwaters' conflict with her supervisors reached a crescendo. She appeared unprepared for shift assignments, accused her superiors of lying, and disappeared during a meeting. Ultimately, her conduct resulted in the termination of her employment.

## I.     The structure of WCDC and the Transportation Unit.

Passwaters, a white female, began working at WCDC in 1998 as a Correctional Officer I. (Deposition of Amy Passwaters ("Passwaters Dep.") 10:14-17, ECF No. 24-1; ECF No. 20.). WCDC officers are divvied among nine Platoons, or "shifts," and several specialized posts: Central Booking, the Transportation Unit, the Intel Unit, and the Road Crew. (Shift Roster 8/17/2017, ECF No. 20-11.) The officers were frequently shuffled among these posts. (Inter-Office Memoranda, ECF No. 20-12.) In 2005, Passwaters was promoted to the rank of Master Correctional Officer ("MCO"). (Passwaters Dep. 11:20-12:19.) As an MCO, Passwaters' duties and responsibilities were "exactly the same" as they had been as a

Correctional Officer. (*Id.* at 12:12-14.) In 2007, Captain Deborah Moore approached Passwaters and asked her if she would be willing to work in the Transportation Unit. (*Id.* at 13:17-14:5.) Assignment to the Transportation Unit was not considered a promotion or a demotion—just one of many possible assignments. (Deposition of Thomas Kimball ("Kimball Dep.") 11:15-16, ECF No. 20-12.)

The Transportation Unit is considered an "elite" unit at WCDC because its officers are trusted to operate without supervision off-site. (Deposition of Captain Preston Foreman ("Foreman Dep.") 16:13-18, ECF No. 24-2.) Officers assigned to the Transportation Unit were required to be "weapon certified" for both handguns and shotguns and to demonstrate a certain level of proficiency on the shooting range. (Passwaters Dep. 13:19-21; 14:17-15:5.) Despite its elite status, Passwaters testified at her deposition that female officers generally disfavored Transportation Unit work and purposefully failed the qualifications for the position to avoid being assigned to Transportation. (Passwaters Dep. 90:15-91:7.)

Traditionally, the Transportation Unit consisted of three male officers and two female officers. (Deposition of Thomas V. Kimball ("Kimball Dep.") 28:13-16, ECF No. 24-3.) During the relevant period, the following officers were assigned to Transportation: the Plaintiff, MCO Passwaters, a white female hired in 1998; MCO Joann Johnson, an African American female hired in 1993; MCO Shawn Kenney, a white male hired in 1998; MCO Kevin Owens, a white male hired in 2011; and MCO Christopher Preston, a white male hired in 2000. (Affidavit of Amy Passwaters ("Passwaters Aff.") ¶ 3, ECF No. 24-5.) When Passwaters joined the Transportation Unit in 2007, she replaced a white female officer. (Passwaters Dep. 15:19-16:2.)

3

## II. Passwaters files grievances in 2010, 2011, and 2013 challenging her assignment out of the Transportation Unit.

The MCOs were rotated out of the Transportation Unit on several occasions to accommodate the training of other officers in the Unit. (Passwaters Dep. 71:11-72:3 73:10-74:8, 75:12-76:1, 76:11-77:1.) Passwaters strongly resisted these reassignments by filing numerous grievances and escalating them through her chain of command. By the year 2017, when Passwaters' conflicts with her supervisors had escalated, Passwaters' chain of command consisted of the following officers: her direct supervisor, Lieutenant Otha Byrd; Byrd's supervisor, Captain Jamison; Colonel Thomas Kimball; and Kimball's supervisor, Director George Kaloroumakis. (Passwaters Dep. 31:5-32:6.)

In June 2010 Colonel Kimball instructed the members of the Transportation Unit to "report to the on duty supervisor" and to "be prepared to assume and perform other duties as assigned by that supervisor." (Inter-Office Correspondence June 4, 2010, ECF No. 20-1.) When Passwaters was selected to be rotated off of the Transportation Unit, she filed a grievance. (Inter-Office Memorandum, Aug. 3, 2010, ECF No. 20-2.) Addressing Passwaters' grievance, Captain Preston Foreman, Operations Captain, explained that Correctional Officers are required to work at any post, that all officers would be rotating off of the Transportation Unit, and that "it just so happen[ed that] the training for Transportation started by having you work another post while other officer[s] are training in Transportation." (*Id.*)

Additional rotations out of the Transportation Unit followed. Between May and September 2011, Major Richard Elliott, Operations Commander, ordered Johnson, Kenney, and Passwaters to report to other shifts. (Inter-Office Memorandum, May 19, 2011, ECF No.

20-3.)  In 2012, the Transportation Unit officers were again "assigned to work on shift" on a rotating basis.  (Email from Jamison, July 2, 2012, ECF No. 20-4.)  In 2013, Passwaters and Johnson were assigned to work another post, for two one-month periods, to accommodate the training of four female officers in Transportation.  (Email from Jamison, Feb. 11, 2013, ECF No. 20-5; Passwaters Dep. 75:12-76:1.)  Shortly after she received this assignment, Passwaters submitted Grievances up her chain of command, complaining that "[t]here [we]re not any other officers at this facility that are being made to work this type of schedule" and that there were "two other officers on transportation that have not been moved at all." (Mem. to Foreman, Feb. 18, 2013, ECF No. 20-7; Mem. from Passwaters to Moore, Feb. 28, 2013, ECF No. 20-7; Mem. from Passwaters to Kimball, ECF No. 20-7.)

In a Grievance Response dated February 25, 2013, Captain Preston Foreman agreed that Passwaters and Johnson had been moved from Transportation on several occasions for the purposes of training and that Passwaters' "observation of [her] male counterparts" was "somewhat accurate." (Grievance Response, Feb. 25, 2013, ECF No. 20-8.)  A subsequent response by Major Moore offered further information.  (Mem. from Moore to Passwaters, Feb. 26, 2013, ECF No. 20-8.)  Major Moore first noted that shift assignments are not a grievable issue under the County Personnel Manual.  (*Id.*)  Major Moore's correspondence further noted that WCDC faced a shortage of female officers trained to perform Transportation Unit duties.  (*Id.*)  Now that more female officers had qualified for the post, WCDC sought to train them through rotations in the Transportation Unit.  (*Id.*)  At the same time, WCDC remained mindful that 95% of the prison population was male and that the

Transportation Unit needed enough male officers to process male inmates.[2] (*Id.*)  Given that

two of the male officers had not yet completed their training, and the third was responsible

for the maintenance of all departmental vehicles, the female trainees would need to rotate with

Passwaters and Johnson.  (*Id.*)   Colonel Kimball's March 6, 2013 Response echoed these

remarks.  (Mem. from Kimball to Passwaters, March 6, 2013, ECF No. 20-8.)  According to

Kimball, seven male officers qualified for the Transportation Unit and had worked as a

Transportation Officer within the past year, compared to only two females.  (*Id.*)  Kimball

"felt it necessary" to correct this male-to-female ratio by rotating more female officers through

the Transportation Unit.  (*Id.*)

Over a period of approximately two months in 2014, the female Transportation

Officers (Passwaters, a white female, and Johnson, an African American female) were once

again rotated out of the Transportation Unit to accommodate the training of other female

officers.  (Email from Lieutenant Michael Jamison, June 23, 2014, ECF No. 20-9.)

## III.    Passwaters challenges her permanent removal from the Transportation Unit in 2016.

On February 12, 2016, Passwaters and her fellow officers within the Transportation

Unit attended a meeting with Colonel Kimball and Captain Moore.  (Passwaters Dep. 92:20-

93:18.)  In the meeting, Kimball and Moore informed the officers that one of them would be

removed from Transportation permanently.  (*Id.* 93:11-14.)   This move came after Captain

Moore (a white female) had recommended reducing the Transportation Unit from five officers

to four, and to accomplish this reduction by removing one of the female officers from her

---

[2] Passwaters does not dispute that additional male officers were required to administer strip searches for the overwhelmingly male inmate population.  (Passwaters Dep. 78:10-79:2.)

post. (Investigation Regarding MCO Passwaters' Complaint of Discrimination by Deputy Director Kimball from Kevin Karpinski, Esquire, at 3-4, ECF No. 20-17.) Later that day, Captain Moore provided Passwaters with an Inter-Office Memorandum bearing her signature which instructed Passwaters to report to "the 7-3 Shift Platoon C" on February 18, 2016, where she was to remain until further notice. (Inter-Office Mem. from Moore to Passwaters, Feb. 12, 2016, ECF No. 20-13; Passwaters Dep. 43:9-11.) Passwaters questioned Colonel Kimball about her removal from the Transportation Unit, having been informed by Captain Moore that the Memorandum was "per the colonel." (Passwaters Dep. 43:12-18.) In response, Passwaters claims, Kimball said that "he did it because he can." (*Id.* at 43:16-17.)

On February 25, 2016, Passwaters lodged an "informal Grievance" in which she complained of "harassment and discrimination." (Mem. from Passwaters to Kaloroumakis, Feb. 26, 2016, ECF No. 20-19.) In her informal Grievance, Passwaters recalled a meeting with Director Kaloroumakis on February 17, 2016, in which she complained about her reassignment and discussed bringing a discrimination and harassment complaint against Colonel Kimball. (*Id.*) In response, Director Kaloroumakis urged Passwaters to keep her complaints "in house." (*Id.*) Passwaters also recalled an interaction with Director Kaloroumakis on February 18, 2016, in which he informed her that she had been chosen to be removed from the Transportation Unit because she was the least senior female on Transportation. (*Id.*) Passwaters' informal Grievance concluded by alleging that she had been "targeted by Col. Kimball for the last 4-5 years" and demanding her return to Transportation. (*Id.*)

On February 26, 2016, Passwaters formalized her Grievance and submitted it to Human Resources.[3] (Passwaters Aff. ¶ 10, ECF No. 24-5.) In her affidavit, Passwaters avers that her superior officer, Lieutenant Byrd, reprimanded her "immediately" after she elevated her complaint to HR, faulting her for wearing transportation uniform pants. (*Id.* ¶ 11.) Passwaters claims that she had not yet been provided the appropriate uniform. (*Id.*) Subsequently, Passwaters submitted a "Matter of Record" or "MOR" which discussed the issue. (Matter of Record I, ECF No. 24-9.) As indicated in Passwaters' affidavit and reflected on the MOR, Passwaters was provided the pants on the following day. (*Id.*; Passwaters Aff. ¶ 10.) Passwaters claims that Colonel Kimball accused her of stealing extra pairs of pants, which she returned, though maintaining that WCDC's property department had provided them to her. (Passwaters Dep. 138:8-139:1.)

## IV.    Passwaters receives a Written Warning after refusing to meet with a Human Resources representative.

On March 1, 2016, Passwaters was scheduled to discuss her complaints with the County's HR Director, Michele Ennis and another HR employee, Anthony Mowers. (Passwaters Aff. ¶ 12; Matter of Record II, ECF No. 20-22.) When Ennis could not attend that meeting, Passwaters was directed to meet with Mowers instead. (*Id.*) Passwaters expressed that she would rather meet with Ennis because Mowers had previously been unable to answer

---

[3] In February 2016, Passwaters also filed a Charge of Discrimination with the Equal Employment Opportunity Commission against the County, alleging discrimination and retaliation. (Passwaters Aff. ¶ 20; Charge of Discrimination, ECF No. 20-32.) The EEOC issued a Notice of Right to Sue dated July 27, 2016. (Notice of Right to Sue, ECF No. 20-33.) The Notice indicated that the EEOC was "unable to conclude that the information obtained establishes violations of the statutes." (*Id.*) The EEOC submitted the Notice to the Maryland State Department of Public Safety & Correctional Services, not Wicomico County. (*Id.*) Kimball never learned of Passwaters' 2016 Charge of Discrimination. (Kimball Dep. 19:6-8.)

her questions. (*Id.*) Ultimately, Passwaters refused to meet with Mowers and the meeting was rescheduled. (*Id.*)

Upon learning of this incident, Lieutenant Byrd recommended a Written Warning, concluding that Passwaters had been "very disrespectful towards Anthony Mowers." (Memo from Byrd, March 8, 2016, ECF No. 20-26.) On March 16, 2016, Passwaters was issued a Written Warning which faulted Passwaters for becoming "upset and disrespectful." (Written Warning, ECF No. 20-27.) The Written Warning[4] informed Passwaters that her actions violated Directive 100.14, Section 17A, "Public Relations," which states, in relevant part: "When dealing with the public, inmates, and each other, employees are to be courteous and respectful." (*Id.*)

In correspondence dated March 24, 2016, Director Kaloroumakis responded to an "informal appeal" his office had received from Passwaters on March 2, 2016—an apparent reference to Passwaters' informal Grievance. (Mem. from Kaloroumakis to Passwaters, March 24, 2016, ECF No. 20-29.) In the Memorandum, Director Kaloroumakis indicated that shift assignments cannot be grieved. (*Id.*) He contended that Passwaters' reassignment was not motivated by discrimination, but rather was the result of the WCDC's decision to downsize the Transportation Unit to three males and one female. (*Id.*) The Memorandum also recalled

---

[4] Passwaters claims that County Executive Bob Culver directed the removal of this Written Warning from her personnel file in March 2016. (Passwaters Dep. 47:6-48:14.) The Written Warning indicates that it would not be placed in her personnel file. (ECF No. 20-27.) It appears, however, that some record of the Written Warning remained available to Passwaters' superior officers after March 2016. (Record of Employee Disciplinary and Corrective Action, Sept. 1, 2017, at 2, ECF No. 24-27.)

that Passwaters had requested adjustments to her shift schedule and that she was granted those accommodations.  (*Id.*)

## V. Passwaters' complaints of discrimination and retaliation are investigated and found to be unsupported by the evidence.

On April 6, 2016, Passwaters filed yet another Grievance for being assigned to shift. (Mem. from Passwaters to Ennis, April 6, 2016, ECF No. 20-28.)  In her Grievance, Passwaters stated that, "I feel that I was discriminated against because I am female" and that "I again, am certain that I am being discriminated against, harassed, and now retaliated against by Colonel Kimball, Captain Deborah Moore and the Wicomico County Department of Corrections." (*Id.* at 1, 3.)  The Grievance cited no evidence for these contentions other than her reassignment from the Transportation Unit.  (*Id.* at 1-3.)

The County conducted a full investigation of Passwaters' complaints of discrimination and retaliation.  To facilitate the investigation, Passwaters agreed to the retention of an investigator, Attorney Kevin Karpinski.[5]  (Passwaters Aff. ¶ 18.)  Following the investigation, Karpinski issued a report which concluded that there was insufficient evidence to support Passwaters' claims.  (Investigation Regarding MCO Amy Passwaters Complaint of Discrimination by Deputy Director Kimball From Kevin Karpinski, Esquire, ECF No. 20-17.)  By the time the investigation had finished, however, Passwaters had returned to the Transportation Unit.  (*Id.* at 17.)  On August 4, 2016, the County rejected Passwaters' Grievance, reasoning that "the County has provided the desired corrective action." (Letter from Ennis to Passwaters, Mar. 24, 2016, ECF No. 20-31.)

---

[5] Mr. Karpinski represents the County in this matter.

The County continued to rotate Passwaters in and out of the Transportation Unit after it rescinded its decision to remove her from the post permanently. Passwaters remained on the Transportation Unit until December 27, 2016, at which point she was rotated elsewhere for thirty days, and then returned on January 27, 2017. (WCDC Transportation Schedule from April 12, 2016 to June 14, 2017, ECF No. 24-20.) She remained in Transportation until May 25, 2017, and then was once again rotated elsewhere for another thirty-day period. (*Id.*)

## VI. Passwaters files additional complaints of discrimination and retaliation in 2017.

In 2017, Passwaters was again reassigned from Transportation, along with a white male officer, Preston. (Informal Grievance, July 31, 2017, ECF No. 20-37.) Once again, Passwaters filed an "informal Grievance" protesting the decision. (*Id.*) This Grievance, like the others, accused Colonel Kimball and the WCDC of "harassment and retaliation." (*Id.*) Passwaters then filed yet another Grievance on the same day, this time complaining about "impartiality and unfairness." (Informal Grievance, July 31, 2017, ECF No. 20-38.) In an attempt to show discriminatory treatment, Passwaters compared her assignments to those of two other Correctional Officers. (*Id.*) Officer "F,"[6] an African American female, was disciplined with a five-day suspension and her removal from the Intel post for falsifying a report; she was then re-instated about two months later. (*Id.*) Officer "R" was removed from Road Crew after "abandoning his post," but "was assigned to return back to Road Crew" the next month. (*Id.*)

---

[6] To preserve their privacy, this Court uses acronyms to refer to officers who are not a party to this litigation. Reference to these officers and their employment history has been filed under seal. (Order, ECF No. 22; Order, ECF No. 26.)

Passwaters alleged that both F and R were "friends" with Colonel Kimball and that he had treated them more favorably than her. (*Id.*)

Once again, Passwaters' Grievance was denied. Captain Michael Jamison informed her that post assignments were not a "grievable issue" and that he could not discuss the personnel issues of other employees. (Mem. from Jamison to Passwaters, Aug. 1, 2017, ECF No. 20-39; Mem. from Jamison to Passwaters, Aug. 1, 2017, ECF No. 20-40.) Subsequently, Passwaters elevated her Grievance to Kimball, who rejected Passwaters' contentions on the same grounds. (Mem. from Kimball to Passwaters, Aug. 3, 2017, ECF No. 20-43; Mem. from Kimball to Passwaters, Aug. 3, 2017, ECF No. 20-44.)

Next, Passwaters filed a formal Grievance dated August 8, 2017. (Mem. from Passwaters to Ennis, Aug. 8, 2017, ECF No. 20-45.) In her Grievance, Passwaters complained of substantially the same issues: her reassignment from the Transportation Unit, her accusations of being "targeted," and Kimball's alleged "harassment and retaliation." (*Id.*) In response, Director Kaloroumakis closed the matter and reiterated what Passwaters had already been told: post assignments cannot be grieved and the disciplinary actions taken against other personnel were confidential. (Mem. from Kaloroumakis to Passwaters, Aug. 21, 2017, ECF No. 20-47.)

## VII. Passwaters receives a letter of reprimand after reporting to shift without corrective eye wear.

On August 25, 2017, Passwaters was assigned to "outside recreation," a post which required the handling of a firearm. (Mem. from Byrd to Jamison, Aug. 27, 2017, ECF No. 20-51; Passwaters Dep. 120:1-5.) On that day, Passwaters reported to Lieutenant Byrd without

her contact lenses or other corrective eye wear. (Passwaters Dep. 120:3-5.) It is undisputed that Passwaters informed Lieutenant Byrd that she was not wearing her contacts. (Incident Report, Aug. 25, 2017, ECF No. 20-52.) The exact manner in which Passwaters addressed Lieutenant Byrd is subject to some dispute. A witness to the exchange, MCO Patricia Dashiell, claims that she did not overhear Passwaters speak in an unprofessional or argumentative manner. (Affidavit of Patricia Dashiell ¶ 3, ECF No. 24-26.) In a Memorandum, Lieutenant Byrd claimed that she addressed him "in an unprofessional manner," told him that "she was not working outside recreation," and "stormed out of the supervisor office." (Mem. from Byrd to Jamison, Aug. 27, 2017, ECF No. 20-51.) Byrd lamented that "Officer Passwaters displays this unprofessional attitude every time things don't go her way and is very disrespectful to supervisor[s] when she [is] given orders that she doesn't agree with." (*Id.*) He recommended a Reprimand, citing violations of Directive 100.14, Section 4L and 6B. (*Id.*) Deputy Director Kimball and Director Kaloroumakis approved the recommendation. (*Id.*; Kaloroumakis Dep. 38:15-20.)

## VIII.   Passwaters receives a one-day suspension after accusing the Captain and HR Director of lying.

On September 8, 2017, Passwaters attended a meeting to discuss disciplinary action concerning the August 25, 2017 incident. (Mem. from Jamison to Kimball, Sept. 8, 2017, ECF No. 20-56.) Present for the meeting were Lieutenant Byrd, Captain Jamison, Colonel Kimball, Director Kaloroumakis, and Human Resources Director Michelle Ennis. (*Id.*) During the meeting, Passwaters received an Official Reprimand, dated September 1, 2017, concerning her actions on August 25, 2017. (Record of Employee Disciplinary and Corrective Action, Sept. 1, 2017, ECF No. 20-53.)

Passwaters took objection to the Official Reprimand and the comments made during the meeting. According to a memorandum prepared after the meeting signed by Jamison and Kimball, Passwaters exclaimed that "she did not want to hear what Captain Jamison had to say because he was a liar." (*Id.*) She also accused Ennis of "lying about [her] past accusations of being investigated." In the memorandum, Captain Jamison concluded that Passwaters' actions were "unprofessional and insubordinate," and recommended that she receive disciplinary action for violation of WCDC Directive 100.14, Section 4, "Respect for the Department," and Section 6, "Professional Demeanor." (*Id.*) Next to his signature on the memorandum, Kimball wrote "concur." (*Id.*) Shortly after this meeting, Passwaters was referred to the Employee Assistance Program as a result of being "unusually critical of supervisor/coworkers/employer." (ECF No. 20-58.)

Following the September 8, 2017 meeting, Passwaters appealed her Letter of Reprimand. (Mem. from Passwaters to Kimball, Sept. 28, 2017, ECF No. 24-28.) In her submission to Kimball, Passwaters reasserted her claims of discrimination and retaliation, arguing that two African American female officers regularly complained to Lieutenant Byrd about their posts and "were able to switch positions without any adverse consequences." (ECF No. 24-28.)

## IX. Passwaters' employment is terminated for insubordination.

On September 19, 2017, while her appeal of the written reprimand was pending, a meeting was conducted to discuss discipline arising from her conduct during the September 8, 2017 meeting. (Mem. from Sterling to Jamison, Sept. 19, 2017, ECF No. 20-60.) In this meeting, Passwaters was to receive a 1-day suspension. (Record of Employee Disciplinary and

Corrective Action, Sept. 19, 2017, ECF No. 20-57.) However, her failure to timely appear for this meeting, followed by her disappearance during the meeting, ultimately resulted in the termination of her employment.

In advance of the meeting, Captain Jamison instructed Sergeant Sterling to inform Passwaters that she was needed in the conference room. (*Id.*) Sterling then called Passwaters and advised her that she was "needed upfront." (*Id.*) About six minutes later, Sterling was asked about Passwaters' whereabouts, and he went to look for her. (*Id.*) During his search, Sterling asked Nina Jefferson if she could check the female locker room. (*Id.*) When Jefferson entered, she found Passwaters standing in the bathroom. (Mem. from Jefferson to Kimball, Sept. 18, 2017, ECF No. 20-61.) Shortly thereafter, Passwaters arrived in the conference room. (*Id.*) Kimball's subsequent review of surveillance footage revealed that Passwaters had left the building, entered her vehicle in the parking lot, then returned and entered the women's locker room—all before arriving at the meeting fifteen minutes after she was ordered to report to the conference room. (Mem. from Kimball to Kaloroumakis, Sept. 20, 2017, ECF No. 20-62.)

When Passwaters reported to the conference room, Captain Jamison informed her about the purpose of the hearing and read her his report of the September 8, 2017 meeting. (*Id.*) After an exchange concerning the accuracy of the report, Deputy Director Kimball asked Passwaters to have a seat in the lobby. (*Id.*) Passwaters exited the meeting and, rather than wait in the lobby, proceeded to the women's locker room to make a phone call. (*Id.*; ECF No. 20-61.) When she returned, Passwaters was advised that she would be receiving a one-day suspension. (ECF No. 20-62.)

Following the meeting, Passwaters appealed her suspension. (Mem. from Passwaters to Byrd, Sept. 26, 2017, ECF No. 24-30.) In her submission, Passwaters denied calling Jamison a "liar" during the September 8, 2017 meeting, claiming that she "merely affirmed that he had lied." (*Id.*) Passwaters also complained that Ennis was "unprofessional" during the hearing and was biased against her. (*Id.*)

Deputy Director Kimball recommended that Passwaters receive disciplinary action for violating WCDC Directive 100.14, Section 4 "Respect for the Department," and Section 5 "Orders." (ECF No. 20-62.) Director Kaloroumakis, however, decided to terminate her employment effective October 6, 2017. (Letter from Kaloroumakis to Passwaters, Sept. 29, 2017, ECF No. 20-63.) Passwaters appealed the termination and her appeal was rejected. (Letter from Passwaters to Ennis, Oct. 3, 2017, ECF No. 20-64; Mem. from Kimball to Passwaters, Oct. 6, 2017, ECF No. 20-65.) Ultimately, the Personnel Appeal Board held a hearing and unanimously upheld the disciplinary actions taken against Passwaters. (Findings of Fact and Decision by Personnel Board, Nov. 2, 2017, ECF No. 20-68.)

## X. Passwaters files suit and accepts an offer of reinstatement.

On October 4, 2017, Passwaters filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging race and gender discrimination and retaliation. After 180 days elapsed since the filing of her Charge, Passwaters requested an obtained a Notice of Right to Sue dated August 6, 2018.[7] (Notice of Right to Sue, ECF No. 1-1.) September 20, 2018, Passwaters commenced this lawsuit. Her Complaint

---

[7] Before filing a Title VII claim in federal court, a plaintiff must first obtain a Notice of Right to Sue from the EEOC. Pursuant to 29 C.F.R. § 1601.28, a plaintiff may obtain the Notice by requesting it after 180 days has elapsed since the filing of a Charge of Discrimination.

brings three counts: retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e and § 20-606 of the State Government (S.G.) Article of the Maryland Annotated Code (Count I); race discrimination in violation of Title VII and S.G. § 20-606 (Count II); and gender discrimination in violation of Title VII and S.G. § 20-606 (Count III).

During the pendency of this action, on August 5, 2019, Passwaters was offered re-employment as a Master Correctional Officer. (Letter from Strausburg to Passwaters, Aug. 5, 2019, ECF No. 20-69.) Passwaters accepted the offer and is once again employed in this capacity with the Wicomico County Department of Corrections. (Email from Passwaters to Strausburg, Aug. 14, 2019, ECF No. 24-42.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, summary judgment is proper "only when no 'reasonable jury could return a verdict for the nonmoving party.'" *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (quoting *Anderson*, 477 U.S. at 255)). When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Anderson*, 477 U.S. at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). As this Court has previously explained, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## ANALYSIS

The County seeks summary judgment in its favor on all of Passwaters' discrimination and retaliation claims.

## I.    Race and Gender Discrimination under Title VII and S.G. § 20-606.

Passwaters' Complaint alleges that her reassignments, written reprimand, one-day suspension, and employment termination were discriminatory on the basis of her race and gender in violation of Title VII and S.G. § 20-606. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions,

or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Maryland's anti-discrimination statute, S.G. § 20-606, prohibits discrimination on these same bases.

The same framework governs Plaintiffs' Title VII and S.G. § 20-606 claims. *See, e.g.*, *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012) (analyzing Title VII and § 20-606 claims together). Where the Plaintiff has failed to adduce direct evidence of discrimination, as here, this Court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the Plaintiff must first establish a *prima facie* case of discrimination. The proof required to meet this burden differs depending on the nature of the plaintiff's allegations. *See id.* at 802 n.13 (noting that "the facts necessarily will vary in Title VII cases, and the . . . prima facie proof" should be adapted to differing factual situations).

To establish a *prima facie* case of discrimination in the enforcement of employee disciplinary measures, the plaintiff must show: "(1) that [she] is a member of the class protected by Title VII; (2) that the prohibited conduct in which [she] engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against [her] were more severe than those enforced against other employees." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *see also Hurst v. District of Columbia*, 681 F. App'x 186, 190 (4th Cir. 2017) (applying the same requirements). To make out a *prima facie* case of discrimination based on an alleged discriminatory discharge, the plaintiff must demonstrate that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties at a level that met her

employer's legitimate expectations; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class."[8] *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). If the plaintiff is able to establish a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse action." *Id.* If the employer meets its burden, the plaintiff then must show that "the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.*

### A. Passwaters' reassignments and Written Warning do not qualify as adverse employment actions.

To prevail on her discrimination claim, Passwaters must at least show that she suffered an "adverse employment action." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (*James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An adverse action "is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Id.* A job reassignment may constitute an "adverse employment action" only if it accompanies a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Id.* (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999). Similarly, a written warning only suffices if it produces actual consequences akin to demotion or termination. *See Adams v. Anne Arundel Cty. Pub. Schools*, 789 F.3d 422, 429 (4th Cir. 2015) (holding that written warnings and verbal reprimands did not qualify as adverse employment actions "because they did not lead to further discipline"); *Jeffers v. Thompson*, 264 F. Supp. 2d

---

[8] There is no dispute that Passwaters' position in the Transportation Unit was filled by an African American female. (Pl.'s Resp. 31, ECF No. 24.) For this reason alone, Passwaters cannot put forth a *prima facie* case of sex discrimination.

314, 330 (D. Md. 2003) (holding that a written reprimand must "work[] a real, rather than speculative, employment injury" to give rise to a Title VII claim).

Between 2010 and 2017, Passwaters vigorously and routinely contested her reassignments out of the Transportation Unit. She now characterizes them as disciplinary measures or adverse employment actions. There is absolutely no support in the record for this contention. There is no dispute that Passwaters always retained the job title of "Master Correctional Officer" and was responsible for carrying out the core duties of that rank, no matter whether she was assigned to the Transportation Unit or some other post. All MCOs were required to perform the post to which they were assigned, and re-assignments were frequent. Passwaters does not allege, and the record does not reveal, that her reassignments to various other posts resulted in a decrease in pay, elimination of promotion opportunities, or some other harm. Quite the opposite—Passwaters claimed that work in the Transportation Unit was generally disfavored and that officers would purposefully fail its requirements to avoid assignment there. The periodic removal from a generally undesirable post, without any decrease in pay or other benefits, cannot constitute an adverse employment action.

Passwaters' March 2016 Written Warning also does not qualify as an adverse action. The issuance of the Written Warning did not correspond to a decrease in pay, demotion, or the like. There is no indication that the March 2016 Written Warning influenced the staff of the WCDC to alter Passwaters' terms or conditions of employment. Although the Written Warning was recorded as a "prior disciplinary action[]" noted in Passwaters' Official Reprimand of September 1, 2017 (ECF No. 20-53), this Official Reprimand did not itself have any immediate effects on Passwaters' employment. Subsequent disciplinary records do not

make any reference to the Written Warning. (*See* ECF No. 20-57) (listing only "Reprimand of September 1, 2017" under the category "prior disciplinary action taken with employee"). Accordingly, the March 2016 Written Warning does not constitute an adverse employment action and cannot support a *prima facie* case of discrimination.

### B. Passwaters has not presented evidence that other employees received lighter discipline for similar infractions.

To establish a *prima facie* case of discrimination based on the discriminatory imposition of disciplinary action, Passwaters must show that "the prohibited conduct in which [she] engaged was comparable in seriousness to misconduct of employees outside the protected class; and . . . that the disciplinary measures enforced against [her] were more severe than those enforced against other employees." *Cook,* 988 F.2d at 511. The plaintiff must identify other employees who have "engaged in the same conduct without . . . mitigating circumstances that would distinguish [her] conduct or the employer's treatment of [her] for it." *Heyward v. Monroe,* 166 F.3d 332, 1998 WL 841494, at *2 (4th Cir.1998) (table opinion) (quoting *Mitchell v. Toledo Hops.,* 964 F.2d 577, 583 (6th Cir.1982)). Although the Fourth Circuit has stated that "the comparison [between offenses] will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances," *Cook v. CSZ Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993), "the similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington,* 545 F.3d 260, 265 (4th Cir. 2008); *see also Elzey v. Wal-Mart Assocs., Inc.,* RDB-11-2151, 2012 WL 3715321 (D. Md. Aug. 28, 2012).

Passwaters has attempted to compare her treatment to several African American female employees, referred to as SJ, M, DD, B, BS, and PD. (Passwaters Dep. 49:18-51:5.) Passwaters claims that Lieutenant Byrd permitted these employees to decline or object to post assignments without reprimand. There is no evidence in the record, however, that these employees engaged in sustained, persistent acts of insubordination like Passwaters. There is certainly no evidence that these employees accused their superior officers of lying (or called them "liars") or fled from a meeting called for the purpose of addressing prior infractions. Given the paucity of information concerning these individuals, a comparison of their treatment to Passwaters' does not yield any inference of discrimination.

Passwaters also compares the disciplinary action she received to action taken against employees R (African American male) and F. According to Passwaters, "R was removed from WCDC's Road Crew position on or about June 12, 2017 because he left inmates performing community service unattended and two inmates escaped and were found hiding in a bathroom." (Passwaters Dep. 54:3-10.) Passwaters also claimed that R received a reprimand and was later returned to Road Crew. (*Id.* at 57:4; 19-21.) A comparison between R's alleged infraction and Passwaters' series of documented incidents of insubordination over a period of years does not suggest that Passwaters was treated unfairly. Any comparison to F is similarly unavailing. Passwaters claims that F "works in the Intel Unit and was shown to have falsified her account of the attempted escape." (*Id.* at 58:8-15.) Passwaters claims that F was initially removed from the Intel Unit, then subsequently reassigned to that post. (*Id.* at 59:13-19.) Again, the accusations levied against F and Passwaters are far too different to generate a meaningful comparison of the disciplinary action taken against them. Though it may be

Passwaters' estimation that R and F made grievous errors deserving of greater punishment, their reassignment to Road Crew and the Intel Unit, respectively, does not suggest that Passwaters' reprimand, suspension, and termination following numerous documented violations of WCDC directives were the product of discrimination.

The record reveals that Passwaters received discipline comparable to those of a different race and gender who had been accused of similar infractions. For example, employee SB (a white male) received a reprimand, suspension without pay, and was eventually terminated after thrice failing to report to duty. (Disciplinary Spreadsheet 1, ECF No. 20-70.) The County imposed suspension without pay on Employee RO for failing to have proper equipment on duty. (*Id.* at 5.) Employee EJ (a black female) received a reprimand for engaging in a verbal altercation with an officer. (*Id.* at 3.) Employee BW (a black female) received suspensions without pay, reprimands, and was ultimately terminated after failing to report for duty. (*Id.* at 7.) These infractions are far more similar to Passwaters' reported failure to arrive at her post with corrective lenses, confrontation with Lieutenant Byrd, and disappearance before and after a disciplinary meeting. The record indicates that Passwaters received similar treatment for similar offenses. Accordingly, Passwaters has failed to establish a *prima facie* case with respect to her claims of discriminatory disciplinary actions.

### C. Passwaters has failed to adduce evidence of pretext.

Passwaters has failed to adduce evidence to show that the County's reasons for disciplining her and firing her amounted to pretext. Even assuming that Passwaters could establish a *prima facie* case of discrimination for either her claim of discriminatory discipline or discriminatory termination, the burden shifts to her employer to "articulate a non-

discriminatory reason for the adverse action." *Cook*, 988 F.2d at 507. Once the County has done so, Passwaters must prove that the County's proffered reason was not its true motive, but is in fact a pretext. *Id.* Comparator evidence is "especially relevant" to a showing that an employer's legitimate non-discriminatory reason is in fact a pretext. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (quoting *McDonnell Douglas*, 411 U.S. at 802.) Passwaters may also meet her burden by showing that the County's "proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).

In this case, the County has cited Passwaters' violations of the WCDC Directives as grounds for imposing discipline and terminating her employment. The County's judgment concerning the discipline of its correctional staff is entitled to some deference. *See Garraghty v. Jordan*, 830 F.2d 1295, 1302 (4th Cir. 1987) (holding that "[r]ealities of the work place, especially in the paramilitary environment of corrections departments, require that authority be respected and that discipline be swift.") In its Motion for Summary Judgment, the County claims that the "business reason for each of its disciplinary measures was to attempt to restore order when the employee had been unprofessional or insubordinate." (Def.'s Mem. Mot. S.J. 31, ECF No. 18-1.) Several supervisors within Passwaters' chain of command determined that her failure to report to her post with corrective eye wear, rude treatment of her supervisors, accusations that her superior officers were "lying" or were "liars," and disappearance from a meeting conducted to discuss these issues all constituted insubordination which could not be tolerated in a correctional setting.

Passwaters has proffered nothing to refute the County's proffered reasons for taking action against her. As discussed *supra*, the record does not reflect that Passwaters was treated more harshly for committing the same infractions as her colleagues. Furthermore, there is no evidence that the County's rationale for disciplining Passwaters and terminating her employment has shifted over time. Without such evidence, Passwaters cannot show pretext. Accordingly, Judgment is ENTERED in favor of the County on Passwaters' claims of race and gender discrimination (Counts II and III).

## II. Retaliation under Title VII and S.G. § 20-606.

To establish a *prima facie* claim of retaliation under Title VII, a plaintiff must prove that (1) she engaged in protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the activity and the adverse action. *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997); *McGrath-Malott v. Maryland*, 565 F. Supp. 2d 656, 670 (D. Md. 2008). Once the plaintiff has presented a *prima facie* case, the familiar *McDonnell Douglas* burden-shifting framework applies. First, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the employee bears the burden of showing that the defendant's stated reason is pretextual. *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### A. Protected Activity.

Passwaters cannot establish a *prima facie* case of discrimination because there is no evidence that she engaged in protected activity. Title VII protects an employee when she opposes "not only . . . employment actions actually unlawful . . . but also employment actions

[she] reasonably believes to be unlawful." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015). This opposition encompasses "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998). The Fourth Circuit noted that while individual acts may be scrutinized to determine "their nature, purpose, and nexus to the alleged objective," the plaintiff's conduct must be examined "*as a whole.*" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015). This inquiry first looks to whether the employee "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009). If this first question is answered in the affirmative, then a court considers whether this communicated belief concerns a practice that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir.2015).

Passwaters appears to argue that all of her complaints filed between 2016 and 2017 constitute protected activity under Title VII.[9] (ECF No. 24 at 29.) The record reveals, however, that the bulk of Passwaters' submissions were not protected because they complained only of shift reassignments. As explained *supra*, Passwaters' reassignments were not unlawful, and it was not reasonable for her to believe otherwise. Passwaters' reassignments

---

[9] The County attempts to cabin Passwaters' asserted protected activity to her February 2016 grievance. (Def.'s Reply 10, ECF No. 28.) Passwaters' Complaint clearly alleges that she engaged in a "series of protected activities by utilizing the County's Grievance Policy" and cites numerous grievances, including the appeal of her written reprimand and suspension. (Compl. ¶¶ 54, 56, 65, ECF No. 1.) To the extent that the County attempts to argue that Passwaters has failed to exhaust her administrative remedies as to all complaints besides her February 2016 grievance, the County has waived such arguments by advancing them at this late stage. *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843 (2019).

were not considered demotions, and did not result in a decrease in pay or other economic benefits. Moreover, reassignments were an ordinary aspect of a correctional officer's job. Passwaters' job description required her to "perform a wide range of correctional work as well as special assignments." (Job Description, ECF No. 18-5.) Beginning in 2010, her supervisors repeatedly explained that she was required to work wherever she was assigned. (*See, e.g.*, Mem. from Foreman to Passwaters, Aug. 3, 2010, ECF No. 20-2) ("Being a Correctional Officer, staff are required to be able [to] work . . . all post[s].")

Even when appealing concrete employment actions, such as her one-day suspension, Passwaters had no objective basis for believing that she was experiencing discrimination. Passwaters claims that that several "salient facts" provided her with reason to believe that she had been discriminated against: (1) Kimball's purported refusal to interact with her; (2) Kimball's decision to "pressure Captain Foreman to give [her] a lower evaluation"; (3) Kimball's admonishments about her appearance, which Passwaters claims were not levied against men or African American women; (4) Kimball's alleged transfer of Passwaters off Transportation "far more than any of the other officers"; and (5) no other officer had been removed from the Transportation Unit permanently. (ECF No. 24 at 27.)

The evidence does not support these claims. First, there is no evidence that Kimball "refused" to speak with Passwaters. Kimball testified that "Miss Passwaters didn't speak to me. If I had anything that had to be said to Miss Passwaters, it was passed on through her supervisor." (Kimball Dep. 15:15-17.) To the extent that Kimball—a superior officer—issued curt replies to Passwaters' inquiries (*see* Passwaters Dep. 43:16-17), there is simply no indication that minor interpersonal issues of this type amounted to discrimination. Second,

there is no evidence that Kimball pressured Foreman to lower Passwaters' evaluation score. Foreman's testimony was only that "there was a question as to my scoring, and I took it back, reevaluated, and did not change the score." (Foreman Dep. 17:7-9.) Third, Kimball's alleged comments about Passwaters appearance do not give rise to any possible inference of discrimination. Passwaters' affidavit merely states that "Colonel Kimball, through Lieutenant Otha Byrd, admonished me about my appearance, specifically 'to put my hair up' despite having made no similar admonitions to males or African American females." (Passwaters Aff. ¶ 5.) The Affidavit is silent as to when such comments were made, whether Passwaters hair was in violation of a uniform code, or if men or African American females ever wore their hair in a similar manner or in a fashion that violated WCDC policy.

Passwaters' perceptions of her reassignments out of Transportation are equally unsupported by the record. Passwaters' representation that she was transferred out of the Transportation Unit "far more" than any other officer is belied by numerous records showing the transfer of several other officers. In 2011, 2012, 2013, and 2014 Passwaters and other Correctional Officers were reassigned while other officers rotated through Transportation for training. (ECF Nos. 20-3, 20-4, 20-5, 20-6, 20-9.) Lastly, while Defendant does not dispute that Passwaters was the only officer to be transferred from the Transportation Unit permanently, this fact does not render Passwaters' complaints objectively reasonable. MCOs like Passwaters were required to "perform a wide range of correctional work as well as special assignments." (Job Description, ECF No. 18-5.) Her relocation to another post was commensurate with these duties.

In sum, there is no evidence that Passwaters engaged in protected activity.  Her retaliation claims fail on this ground alone.

**B. Pretext.**

As previously discussed, Passwaters has also failed to produce evidence to suggest that the County's reasons for terminating her employment were pretextual.  Passwaters' failure to meet her evidentiary burden on this issue is dispositive of her retaliation claim.  Accordingly, Judgment is ENTERED in favor of the County on Passwaters' retaliation claim. (Count I).

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (ECF No. 18) is GRANTED and Summary Judgment is ENTERED in favor of the Defendant.

A separate Order follows.

Dated: November 27, 2019

\_\_\_\_/s/_____
Richard D. Bennett
United States District Judge